**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 31, 2023**

# In the Court of Appeals of Georgia

A23A0153. THE STATE v. BLY.

MILLER, Presiding Judge.

Martesha Bly was charged with trafficking in illegal drugs and possession of a firearm during the commission of a felony. The State appeals from the trial court's order granting Bly's motion to suppress, arguing that (1) the trial court erred by determining that Bly did not commit a traffic infraction; and (2) the trial court erred by determining that law enforcement illegally detained Bly following the traffic stop. For the reasons that follow, we affirm the trial court's order granting Bly's motion to suppress.

The following well-established principles guide our review in this matter:

> In a hearing on a motion to suppress, the trial court sits as the trier of fact and its findings are analogous to a jury verdict. Accordingly, we defer to the trial court's credibility determinations and will not disturb

its factual findings in the absence of clear error. And when reviewing the grant or denial of a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. Additionally, as a general rule, appellate courts must limit their consideration of the disputed facts to those expressly found by the trial court. An appellate court may, however, consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape. Finally, although we defer to the trial court's factfinding, we owe no deference to the trial court's legal conclusions. Instead, we independently apply the law to the facts as found by the trial court.

(Citations and punctuation omitted.) *State v. Cullier*, 351 Ga. App. 19 (830 SE2d 434) (2019).

So viewed, the evidentiary record, which includes the officers' testimony and the video footage of the traffic stop, shows the following: The special investigations unit of the Gwinnett County Police Department was conducting a narcotics investigation into Miguel Vilches, who, in May and July of 2022, sold narcotics to an undercover officer. Neither Bly nor her vehicle, however, were being investigated by the department. On September 2, 2020, Special Investigator Danielle Reid followed Vilches to an apartment complex, but she was unaware whether Vilches

2

lived at the complex. Corporal William Wolfe of the Gwinnett County Police Department was also assisting Reid with the investigation that day, and he was notified by other officers on scene that Vilches was located at a carwash inside the apartment complex. Corporal Wolfe, who had previously purchased narcotics from Vilches during an undercover operation, observed Vilches get into the back seat of a red Toyota Camry bearing an Alabama tag and then exit the Toyota to get back into his vehicle. The driver of the Toyota, later identified as Bly, exited her vehicle, walked to the trunk of her car, and placed a white shoe box inside the trunk. Bly then got back into her vehicle and left the area. Neither Investigator Reid nor Corporal Wolfe observed Vilches handle the white shoe box at any point. Investigator Reid testified that she did not observe Vilches engage in any criminal activity and that there was no evidence that Vilches had given Bly the white shoe box, and Corporal Wolfe similarly testified that there was no evidence that the white shoe box was not already inside the Toyota before Vilches' encounter with Bly. Corporal Wolfe further testified that he did not observe anything "unlawful" in Vilches' interaction with Bly, but he noticed that Vilches was carrying a backpack that was "almost identical" to the backpack that he carried when he sold narcotics to undercover officers.

3

Investigator Reid followed Bly as Bly traveled to a nearby gas station where she observed Bly exit her vehicle, walk to the trunk of her car, open and close the trunk, and drive away. Investigator Reid then followed Bly as she traveled along Interstate 85 where Investigator Reid observed Bly make "an unsafe lane change" by "dart[ing] over a solid white lane" to exit the highway. Investigator Reid then relayed the information concerning the traffic violation to other officers who were assisting her. Officer Taveras[1] subsequently initiated a traffic stop on Bly's vehicle and informed her that she was stopped for failing to use a turn signal when exiting the highway.[2] Bly gave Officer Taveras her driver's license and insurance information, and Officer Taveras returned to her vehicle to check Bly's documents. After running a check on Bly's documents, Officer Taveras returned to Bly and informed her that it was "protocol" to check vehicles for illegal contraband "because of everything going on," and she asked Bly for consent to search her vehicle. Bly declined, and

---

[1] Officer Taveras did not testify at the motion hearing, but the footage from her body camera was entered into evidence.

[2] The video recording begins with Officer Taveras exiting her patrol vehicle and approaching Bly, who was already standing outside and walking away from her parked vehicle. Thus, the alleged traffic infraction was not captured on video.

4

Officer Taveras then returned to her vehicle and made a phone call.[3] After the call, Officer Taveras returned to Bly and again informed her of the "protocol" for searching vehicles and stated that a K-9 officer was en route to conduct a search of her vehicle. Bly asked if she was free to leave, to which Officer Taveras responded "no" because she needed to wait for the K-9 officer. Another officer arrived at the scene and told Officer Taveras to issue a citation, at which point Officer Taveras returned to her patrol vehicle and apparently filled out a citation. Officer Taveras then returned to Bly and informed her that she would search the vehicle if the K-9 officer gave an alert after the free-air sniff. A K-9 officer arrived moments later and conducted a free-air sniff and alerted to the vehicle. Following a search of Bly's trunk, although no drugs were found in the white shoe box, law enforcement found 700 grams and 300 grams of a "tan substance" that field-tested positive for heroin and a white substance that field-tested positve for fentanyl.[4]

Bly was indicted on one count of trafficking in illegal drugs (OCGA § 16-13-31 (b)) and one count of possession of a firearm during the commission of a felony

---

[3] The audio on the video recording stops while she makes the phone call.

[4] A firearm was also found during the search of the vehicle.

(OCGA § 16-11-106).[5] Bly moved to suppress the evidence obtained from the traffic stop, arguing that law enforcement lacked reasonable suspicion to initiate a traffic stop of her vehicle and that law enforcement unlawfully prolonged her detention. The trial court granted Bly's motion to suppress following a hearing, determining that (1) the interaction between Bly and Vilches at the apartment complex did not rise to the level of a reasonable suspicion that criminal activity had occurred; and that (2) after evaluating Investigator Reid's credibility, Bly did not commit any traffic violations.[6] This appeal followed.

1. First, the State argues that the trial court erred by granting Bly's motion to suppress because the officers' observations were consistent, that Bly was lawfully stopped for committing traffic infractions, and that the officers possessed reasonable suspicion to detain Bly based upon her interaction with Vilches at the apartment complex. We discern no errors in the trial court's rulings on these issues.

*(a) Reasonable Suspicion Based on the Traffic Infractions*

---

[5] Vilches was also charged with two counts of trafficking in illegal drugs (OCGA § 16-13-31 (b)) and one count of trafficking methamphetamine or amphetamine (OCGA § 16-13-31 (e)) in the same indictment.

[6] The trial court also suppressed Bly's statements to law enforcement.

The State first argues that there was reasonable suspicion to justify a stop of Bly's vehicle based on the commission of two traffic infractions. "In order to initiate a traffic stop, a law enforcement officer must have specific and articulable facts that provide a reasonable suspicion that the individual being stopped is engaged in criminal activity." (Citation and punctuation omitted.) *Abercrombie v. State*, 343 Ga. App. 774, 777 (1) (808 SE2d 245) (2017). Generally, "[t]he stop of a vehicle is authorized if the officer observes a traffic offense." *State v. Parke*, 304 Ga. App. 124, 126 (695 SE2d 413) (2010). And, "the constitutional reasonableness of traffic stops [does] not depend on the actual motivations of the individual officers involved." (Citation omitted.) *Rodriguez v. State*, 295 Ga. 362, 371 (2) (b) n.13 (761 SE2d 19) (2014). Nevertheless, the trial court sits as the finder of fact in adjudicating a motion to suppress, and it is the trial court's responsibility to determine the credibility of a witness' testimony, even if the witness is a police officer. See *Jones v. State*, 319 Ga. App. 678, 679 (1) (738 SE2d 130) (2013) ("[I]t was for the trial court, sitting as finder of fact in ruling on the motion to suppress, to determine the credibility of the officer's testimony."). Therefore, a trial court is not obligated to believe an officer's testimony even if the testimony is uncontradicted, and it may accept or reject any portion of the testimony. *Hughes v. State*, 296 Ga. 744, 747 (1) (770 SE2d 636) (2015).

7

Applying the aforementioned principles, we are bound to accept the trial court's credibility determinations and its findings of fact, which are not clearly erroneous in light of the evidentiary record. The trial court found that, after evaluating Officer Reid's credibility, no traffic infraction had occurred to justify the stop of Bly's vehicle. The State's argument that Investigator Reid's observation of Bly making an unsafe lane change and Officer Taveras' observation of Bly failing to use her turn signal are not "mutually exclusive" and can occur simultaneously misses the point. The trial court specifically stated in its order that it reached its conclusion that Bly did not commit any traffic violations after "*[e]valuating the credibility*" of Investigator Reid. "[W]e cannot . . . make a credibility determination contrary to the one made by the trial court[.]" *State v. Damato*, 302 Ga. App. 181, 182-183 (1) (690 SE2d 478) (2010) (affirming the trial court's determination that there was no probable cause to arrest the defendant for DUI less safe where the trial court reached its conclusion after determining that the officer's testimony regarding probable cause for the arrest was not credible); *Varnadoe v. State*, 227 Ga. App. 663, 665 (4) (490 SE2d 517) (1997) ("This Court will not second guess the trial court which heard testimony from this witness . . . and was in a position to evaluate the demeanor of the witness and the credibility of [her] testimony."). Additionally, Officer Taveras did not testify

8

below at the hearing, and Corporal Wolfe testified that he did not have any "direct involvement with the stop," and that he was only in "the general vicinity" at the time of the stop. Furthermore, the video of the traffic stop does not depict the alleged traffic infractions. Therefore, in viewing the evidentiary record in the light most favorable to the trial court's findings and judgment and because we are bound by the trial court's credibility determination, we cannot say that the trial court erred by determining that Bly did not commit any traffic violations to permit a stop of her vehicle. Accordingly, this enumeration of error fails.

*(b) Reasonable Suspicion Based on Bly's Interaction with Vilches*

The State further argues that, notwithstanding the trial court's determination regarding Investigator Reid's testimony about the traffic offenses, law enforcement still possessed a reasonable suspicion to initiate a traffic stop of Bly's vehicle based on her interaction with Vilches at the apartment complex. We conclude that Bly's interaction with Vilches at the apartment complex did not give rise to the level of reasonable suspicion necessary to permit a traffic stop of her vehicle.

In assessing reasonable suspicion, we have been clear that

[the] reasonable suspicion must be based on more than a subjective, general suspicion or hunch. The detention must be justified by specific

9

and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the detention. The officer must have had a particularized and objective basis for suspecting the defendant of criminal activity. The suspicion must be one that provides a basis from which the court can determine that the detention was not arbitrary or harassing. Whether a given set of facts rises to the level of reasonable suspicion is a legal question.

(Citations and punctuation omitted.) *Rosas v. State*, 276 Ga. App. 513, 516 (1) (b) (624 SE2d 142) (2005). "[N]o mathematical formula exists for deciding whether the totality of the circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity." (Citation omitted.) Id. at 517 (1) (b). Nevertheless, we have held that a police officer witnessing a suspect "fitting a pattern of criminal behavior in a high crime area" does not provide a reasonable, articulable suspicion to detain the individual. *Runnells v. State*, 357 Ga. App. 572, 576 (1) (851 SE2d 196) (2020).

Here, Investigator Reid testified that her department had been conducting a narcotics investigation into Vilches, who had previously sold narcotics during an undercover operation. Investigator Reid followed Vilches to an apartment complex where he "supposedly" interacted with Bly "in some way" inside Bly's vehicle, but Investigator Reid did not observe him engaging in any criminal activity, and she did

10

not have any reason to suspect that narcotics were inside the white shoe box. Corporal Wolfe observed that Vilches was carrying a backpack similar to the one he carried when he sold drugs to Corporal Wolfe, but he did not observe Vilches engage in any criminal activity, and he could only "speculate" that the white shoe box contained narcotics.

We conclude that, based on the totality of the circumstances, law enforcement did not possess a reasonable suspicion that Bly was engaged in criminal activity to justify a stop of her vehicle. Investigator Reid only "supposed" that Vilches and Bly interacted in Bly's vehicle, and Corporal Wolfe did not see Vilches handle the shoe box at any point and he could not determine whether the shoe box was already inside of Bly's vehicle before Vilches entered her vehicle. There was also no testimony that the officers actually observed any hand-to-hand exchanges of any kind between Vilches and Bly, nor was there any testimony as to whether this particular neighborhood was a high-crime area or was otherwise known for drug activity. Furthermore, the testimony was clear that neither Bly nor her vehicle was involved in the department's narcotics investigation, and there was no testimony that the officers received information that Vilches or Bly would complete a drug transaction that day at that location. Therefore, at the very most, the officers merely observed that

11

Bly "fit[] a pattern of criminal behavior" which we have held is insufficient to warrant an investigative detention. *Runnells*, supra, 357 Ga. App. at 576 (1). And "[w]hile [the officers'] suspicions turned out to be warranted, when we look, as we must, at the basis of [their] suspicions prior to the initiation of the detention, we find it insufficient to meet the particularized and objective basis required." Id. at 579 (1) (no reasonable suspicion to initiate a traffic stop of the defendant's vehicle based on the defendant's interaction with another male in a high crime area known for drug activity, where the officer observed the defendant place a backpack in the trunk of his car after interacting with the male, but did not observe any hand-to-hand exchanges before the male fled the scene after spotting the officer's car). Compare *Holden v. State*, 241 Ga. App. 524, 526 (527 SE2d 237) (1999) (investigative stop of the defendant's vehicle was supported by reasonable suspicion where law enforcement observed the defendant in a car with a well-known drug dealer at a location and time that the drug dealer typically sold drugs, the location was "notorious" for drug sales, law enforcement was aware that the drug dealer did not live there, law enforcement observed that the drug dealer's behavior during the stop was consistent with the "modus operandi" he typically used when selling narcotics, and the defendant appeared "nervous" while in the car). Consequently, the trial court did not err by

concluding that the officers lacked reasonable suspicion to conduct a traffic stop of Bly's vehicle.

2. Next, the State argues that the trial court erred by determining that law enforcement lacked reasonable suspicion to prolong Bly's detention following the traffic stop. In light of our holding in Division 1, supra, it is unnecessary for us to address this claim.

Accordingly, for the reasons stated above, we affirm the trial court's order granting Bly's motion to suppress.

*Judgment affirmed. Mercier and Hodges, JJ., concur*.